UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
DEVANAND PERSAUD,

                    Plaintiff,

    -against-                                No. 22-CV-02919(AS)

THE CITY OF NEW YORK, and SHERIF
SOLIMAN, WILLIAM MARSHALL,
and ARI LIEBERMAN, in their individual
and official capacities,

                    Defendants.

---------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 2

STANDARD OF REVIEW ............................................................................................... 7

ARGUMENT ..................................................................................................................... 8

   I.    JUDGE VYSKOCIL DETERMINED THAT COLLATERAL ESTOPPEL DOES  NOT APPLY, NOR SHOULD IT BECAUSE THE ELEMENTS ARE NOT MET........................... 8

      A.   Law of the case Prohibits Applying Collateral Estoppel................................. 8

      B.   The Issues Are not Identical and Persaud was Deprived of the Opportunity to Fully  and Fairly Litigate at OATH......................................................................... 8

   II.    DEFENDANTS OVERTLY TOOK ADVERSE ACTIONS AGAINST PERSAUD BECAUSE OF A FACEBOOK POST WHICH IS PROTECTED SPEECH .......................... 10

      A.   Oil, Labor, and Democracy are Matters of Public Concern Unrelated to Persaud's  Work at the DOF ........................................................................................ 10

      B.   Opening an Investigation, Initiating charges, and Termination are Adverse Actions .... 14

      C.   Defendants Charging Persaud for the Facebook Post is Direct Evidence of  Retaliation, But Indirect Evidence Also Supports Causation................................ 15

   III.    PERSAUD'S INTEREST IN MAKING THE SPEECH FAR OUTWEIGHS ANY INTEREST THE CITY HAS IN REGULATING THE SPEECH ........................................... 21

   IV.    THE CITY IS LIABLE BECAUSE A FINAL POLICYMAKER MADE THE TERMINATION DECISION ................................................................................. 22

CONCLUSION.................................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

Broich v. Inc. Vill. of Southampton, 462 Fed. App'x 39 (2d Cir. 2012) ....................................... 14

Burkybile v. Bd. of Educ., 411 F.3d 306 (2d Cir. 2005) ............................................................... 14

Burrage v. United States, 571 U.S. 204 (2014)............................................................................. 15

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)................................................................................ 7

De Johnson v. Holder, 564 F.3d 95 (2d Cir. 2009) ........................................................................ 8

Gronowski v. Spencer, 424 F.3d 285 (2d Cir. 2005)..................................................................... 10

Gusler v. City of Long Beach, 715 Fed. App'x 68 (2d Cir. 2018)................................................. 21

Heffernan v. City of Paterson, 578 U.S. 266 (2016)..................................................................... 20

Henek v. CSC Holdings, LLC, 449 F. Supp. 3d 35 (E.D.N.Y. 2020) .......................................... 12

Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011) ....................................................................... 10, 21

Kwan v. Andalex Group., 737 F.3d 834 (2d Cir. 2013) ............................................................... 15

Lehal v. Central Falls Detention Facility Corp., 13cv3923, 2016 U.S. Dist. LEXIS 177587
    (S.D.N.Y. Nov. 21, 2016) ....................................................................................................... 22

Lewis v. Cohen, 165 F.3d 154 (2d Cir. 1999) .............................................................................. 21

Matusick v. Erie County Water Auth., 757 F.3d 31 (2d Cir. 2014)................................................ 9

Monell v. Dep't of Soc. Servs., 436 U.S. 658  (1978) ................................................................. 22

Montero v. City of Yonkers, 890 F.3d 386 (2d Cir. 2018) ........................................................... 10

Morales v. City of New York, 21-925-cv, 2022 U.S. App. LEXIS 20112, 2022 WL 2840035 (2d
    Cir. July 21, 2022)................................................................................................................... 15

Nagle v. Marron, 663 F.3d 100 (2d Cir. 2011) ............................................................................ 23

Naumovski v. Norris, 934 F.3d 200 (2d Cir. 2019)...................................................................... 17

Pappas v. Giuliani, 290 F.3d 143 (2d Cir. 2002).......................................................................... 11

Persaud v. City of New York, 22-CV-02919, 2023 U.S. Dist. LEXIS 53182, 2023 WL 2664078
    (S.D.N.Y. Mar. 28, 2023) ................................................................................................ 1, 8, 16

Rankin v. McPherson, 483 U.S. 378 (1987) ................................................................................. 21

Rookard v. Health and Hosp. Corp., 710 F.2d 41 (2d Cir. 1983)................................................ 23

Sheppard v. Beerman, 94 F.3d 823 (2d. Cir. 1996)...................................................................... 10

Skehan v. Village of Mamaroneck, 465 F.3d 96 (2d Cir. 2006).................................................... 10

Smith v. County of Suffolk, 776 F.3d 114 (2d Cir. 2015) ................................... 14, 15, 18

Sousa v. Roque, 578 F.3d 164 (2d Cir. 2009) .............................................................. 10

Tolan v. Cotton, 572 U.S. 650 (2014) ............................................................................ 7

Waters v. Churchill, 511 U.S. 661 (1994) .....................................................................11

Wiggins v. Griffin, 86 F.4th 987 (2d Cir. 2023) ........................................................... 7

## PRELIMINARY STATEMENT

While Plaintiff Devanand Persaud was employed by New York City's Department of Finance ("DOF"), a post was published to his Facebook account (the "Facebook Post"). The Facebook Post was a response to another social media posting of a newspaper article which discussed the labor market in Guyana, and public opinion about the Guyanese job market. Defendants, the City of New York (the "City"), Sherif Soliman, William Marshall, and Ari Lieberman, knew the Facebook Post "was something having to do with Guyanese politics." Armed with this knowledge, Defendants investigated Persaud, charged him disciplinarily for making the Facebook Post, then terminated him.

Based on the foregoing, Persaud filed this action alleging First Amendment retaliation (as enforced by 42 U.S.C. § 1983). Defendants filed a motion to dismiss, which Judge Vyskocil denied in its entirety. Persaud v. City of New York, 22-CV-02919, 2023 U.S. Dist. LEXIS 53182, 2023 WL 2664078 (S.D.N.Y. Mar. 28, 2023). Now that discovery is complete, Defendants again ask the Court to dismiss the case.

Issues of fact prevent granting Defendants' motion. The primary issue Defendants put before the Court is whether Defendants' had the requisite intent. The Second Circuit has ruled that when an employer overtly charges an employee based on protected speech, the employee has presented direct evidence of retaliation. Here, Defendants overtly charged Persaud based on the speech, copying verbatim the entire Facebook Post directly into the only specification supporting four of the six disciplinary charges. Accordingly, along with the other evidence of causation presented below, summary judgment cannot be granted.

Additionally, Defendants invoke the Pickering defense, arguing that their interest in regulating the speech outweighed Persaud's interest in making the speech. But, the Supreme

1

Court dictates that in situations like this, where the worker is not a policymaker or in a confidential position, and has little to no interaction with the public, the employer's interest in regulating speech is "minimal." On the other hand, the interest in protecting the speech here is great because it touches on important social issues, to wit, the labor market in Guyana. Accordingly, Defendants cannot prevail on their <u>Pickering</u> defense.

Plaintiff elaborates on these, and other arguments, below.

### STATEMENT OF FACTS

Persaud identifies as an East Asian, East Indian, having been born in Guyana. (Persaud 16). In 1984, at age seven, Persaud emigrated to the United States. (Persaud 16). Persaud's father was also born in Guyana, and emigrated to the United States in 1979. (Persaud 20). Persaud lives with his mother and father in Elmhurst, New York. (Persaud 5-6; 19).

In January 2017, the DOF hired Persaud to the civil service position of Accountant. (Persaud 32-33). The City also assigned Persaud an internal office title of Reconciliation Specialist. (Persaud 33-34). Persaud's responsibilities included reconciling the money deposited into City bank accounts, corresponding with bank officials and City officials concerning the City's banking transactions, and verifying employee timesheets. (Persaud 35-36).

In 2019, the City promoted Persaud to Reconciliation Supervisor. (Persaud 34). Upon the promotion, Persaud accepted additional responsibilities over more City bank accounts and reviewed employee timesheets. (Persaud 33-37). Throughout his time working for the DOF, Persaud belonged to union "DC 37" and reported to supervisor Sarita Campbell. (Persaud 37-38; 41). DOF Assistant Commissioner Smith knew Persaud and believed him to be "mild mannered and quiet" and understood that he was "well regarded" by Campbell.  (Smith 8, 14).

Kaietuer News is a newspaper in Guyana. (Persaud 110). On October 13, 2020, author Peeping Tom published an article in Kaietuer News entitled, "Gutter Work." (Persaud 110; DE #67-4 at 32). In sum and substance, the article recounts a story narrated by "a young man who said he was from the ghetto." (DE #67-13 at 138). Another man offered the narrator a job "cleaning gutters," but the narrator considered the job disrespectful because, now that Guyana is an oil producing country, he believed he should have a better job pumping oil. Id. The article then explained the public's responses to the narrator's story, essentially noting that two sides of the story about "work in Guyana" emerged – one side which believed the story "typifies" views of the ghetto as being fit for only certain type of work (ghetto work) to the exclusion of better paying opportunities, and another side which believed there is nothing wrong with doing manual work such as cleaning gutters. Id. In sum, "Gutter Work" was really an article about the public's response to the narrator's story, rather than about the narrator himself. (DE #67-13 at 138).

Kaieteur News shared the article on its Facebook page. (DE #67-13 at 24). At around that time, thirty-four individuals commented on the post, including a post attributable to Persaud's Facebook account. Id. Persaud's father, however, made the post. (Persaud 89). The post was about "working conditions, labor issues, and the political dynamics in Guyana in 2020." (Persaud 89). Specifically, Persaud's father posted:

> That is only work suitable for those ghetto rats! Oil jobs are for decent, hardworking, respectable people who vote for democracy and progress! The oil money belongs to supporters of democracy!
>
> Those who didn't vote democracy on March 2, 2020 elections should not get one cent of benefit from oil wealth or oil jobs!
>
> Let those ghetto rats go to Granger and Harmon for jobs!

(DE #67-13 at 24) (the "Facebook Post").

3

After the post, NYC's webmaster received four alleged comments about the Facebook Post, along with a screenshot of the post. (DE #67-4 at 1-2; Marshall 10; Ex. I at 1-26). The webmaster believed the individuals were "most likely working together." (DE #67-4 at 1-2).

Ultimately, the messages were sent to Lieberman, the DOF's Department Advocate, who in turn, passed them along to Marshall, head of the DOF's EEO office. (DE 67-4 at 1; Lieberman 7). Lieberman, had no independent understanding of the term "ghetto rats" and, to this day, he has no idea whether it refers to black people or national origin, because "it's not a term [he's] familiar with." (Lieberman 14, 26). Notably, Smith also has no idea what "ghetto rats" means and he was surprised the Facebook Post "started off this whole thing." (Smith 28). Smith "was told" that Persaud had "gotten into some sort of verbal dispute on Facebook about something having to do with Guyanese politics." (Smith 30).

 Marshall understood that, in context, the Facebook Post, and the term "ghetto rats" in particular, was referring to "employees who are not – who should not receive certain types of jobs." (Marshall 15). Marshall confirmed that he understood "ghetto rats" did not refer to "the entirety of Guyana," but rather, "to a specific group of Guyanese individuals." (Marshall 16). In other words, he understood "ghetto rats" was not a reference to the people of Guyanese national origin, but rather to "individuals who were not offered those jobs." (Marshall 22). Though Marshall had discretion on the matter, he decided to open an investigation relating to the Facebook Post. (Marshall 30-31).

On October 28, 2020, Lieberman emailed Marshall a link to a "header" of the Article and the Facebook Post. (DE #67-4 at 26). Lieberman acknowledged that the information "adds some more context" to the Facebook Post. (Id.). Lieberman, however, felt insulted because he believed

Persaud was not cooperating with him, thereby making Lieberman's job "impossible." (Smith 16-17).

On October 29, 2020, Lieberman issued five charges to Persaud. (Lieberman 19; DE #67-4 at 28-31). Four of the five charges arose from the Facebook Post, and the specifications which support those charges copy verbatim the entirety of the Facebook Post. (DE #67-4 at 28-3).

On November 2, 2020, Persaud submitted to Lieberman an answer and responses to the charges. (DE #67-4 at 34-35). Persaud's response noted that the Facebook Post included the word "democracy," and it called individuals "hardworking, respectable people." (DE #67-4 at 34). Persaud further pointed out that the Facebook Post made no "intentional reference to any individual or groups." Id.

On December 1, 2020, the DOF held an "Informal Conference" concerning the charges. (DE #67-4 at 42-45). An Informal Conference is held pursuant to the union's agreement with the City. (Lieberman 39-40). A "Leader . . . Listens to the case," then issues a non-binding decision "about what he or she believes should be the outcome of the case." (Lieberman 39-40). Persaud did not appear at the conference, but the Leader, after hearing the City's evidence, nonetheless issued a decision of merely a two-week suspension with a formal reprimand. (DE #67-4 at 42-45; Lieberman 39-40). In conflict with this decision, Lieberman's office sent to Persaud a notification of the Leader's decision, with the option to accept a penalty of termination in lieu of a hearing. (DE #67-4 at 45; Lieberman 41-42).

On December 8, 2020, Persaud requested that then DOF Commissioner Michael Hyman, appear at the pre-trial conference related to the charges and he identified the relevant information Hyman had to testify about. (DE #67-4 at 36-37). The request was ultimately forwarded to Lieberman who determined that Hyman was not relevant because the only two issues which he

believed needed to be proven at the hearing were "1) Were these comments posted to [Persaud's] account? 2) Did he fail to cooperate with the Advocate's Office and/or the EEO?" (DE #67-4 at 36-37; Lieberman 37-38).

On April 13, 2021, Marshall approved his office's report concerning its investigation of the Facebook Post. (Ex. C Exhibits at 3-6). Though Marshall had discretion, he elected to refer the matter to the Department Advocate's office. (Marshall 25-26).

The charges were scheduled to be heard on May 25, 2021. (DE #67-4 at 33). Before the trial, Lieberman wanted to amend the charges to add charges related to the EEO office's investigation. (DE #67-4 at 33; Lieberman 30-31). Lieberman successfully added a charge and a specification. (DE #67-10 at 2).

OATH scheduled hearing dates for May 26, 2021 and June 22, 2021. (56.1 at ¶ 49). On June 7, 2021, Persaud emailed the ALJ requesting that the June 22nd date be adjourned because his father would be out of the county and unable to testify. (Ex. 2 at 2057). Further, while out of the country, Persaud expected that his father would be able to locate the four alleged complainants about the Facebook Post, so they could testify. (Ex. 2 at 2057). The City objected to Persaud's adjournment request because the ALJ had already stated that the June 22nd date was "firm." (Ex. 2 at 2057). The hearing proceeded on the 22nd. (56.1 at ¶ 49).

On June 25, 2021, just days after the hearing, one of the commenters, Christopher De Costa, confirmed that he did not file any complaints with the City against Persaud. (Ex. 1).

On November 12, 2021, ALJ McGeachy-Kuls issued the report and recommendation concerning the charges. (DE #67-4 at 63). Lieberman considered the decision "a big win." (DE 67-4 at 63). He believed it was a big win because "a lot of work went into" the case and he was glad it "bore fruits." (DE #52).

On November 17, 2021, Assistant Commissioner Smith emailed Lieberman and another City official indicating that he wanted Soliman "to make a decision promptly" about Persaud's fate and that Smith "could support alternatives to dismissing Mr. Persaud." (DE #67-4 at 61; Lieberman 50). But, Smith changed his mind "in light of additional background and context info" and intended to "advoc[ate]" for Persaud's immediate termination. (DE #67-4 at 61). Smith's penalty recommendation alteration had nothing to do with the charges, but rather, were based on Smith's observation of Persaud in the workplace which he believed showed Persaud was under stress. (Smith 23, 30-31). Also, Campbell told Smith that people in the workplace were concerned about their personal safety. (Smith 23-24).

Lieberman, along with the General Counsel, decided to pursue the penalty of termination. (Lieberman 56). At the time, Soliman was the Commissioner of the DOF. (Soliman 7). Soliman was responsible for overseeing the entire department. (Soliman 7). As an agency head, Soliman was vested with the authority to terminate employees in his department. (Soliman 9). Neither the mayor nor the City council must approve a decision to terminate a DOF employee. (Soliman 11).

On November 18, 2021, the City terminated Persaud. (DE #67-15). Soliman made the ultimate decision to terminate Persaud based on the "EEO matter." (Soliman 10). Soliman is aware of "no other reasons" for the decision. (Soliman 10-11).

## STANDARD OF REVIEW

In reviewing summary judgment motions, the record must be viewed in a light "most favorable" to the non-movant. Wiggins v. Griffin, 86 F.4th 987, 998 (2d Cir. 2023) (quotations omitted). Issues of fact may not be resolved in favor of the movant and the motion must be denied if any genuine issue of material fact exists. Tolan v. Cotton, 572 U.S. 650, 657 (2014); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

**ARGUMENT**

**I.    JUDGE VYSKOCIL DETERMINED THAT COLLATERAL ESTOPPEL DOES NOT APPLY, NOR SHOULD IT BECAUSE THE ELEMENTS ARE NOT MET**

Defendants argue that the ALJ's factual findings are entitled to preclusive effect because of collateral estoppel. As discussed below, (A) Judge Vyskocil has already rejected Defendants' argument, and (B) collateral estoppel should not apply because the issues were not necessarily decided and Defendants denied Persaud the opportunity to fairly litigate his case.

**A.    Law of the case Prohibits Applying Collateral Estoppel**

When a court has already ruled on an issue, the court should "adhere" to that decision in "subsequent stages in the same case." De Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009) (quotations omitted). A court may deviate from the law of the case only in situations where a cogent or compelling reason exists to do so, such as a change in law, availability of new evidence, or the need to correct clear error. Id. (quotation omitted).

Defendants' motion to dismiss included a collateral estoppel argument based on the ALJ's determinations. (DE #28 at 6). Judge Vyskocil considered and rejected Defendants' assertion that the ALJ's decision has collateral estoppel effect here. Persaud, 2023 U.S. Dist. LEXIS 53182, at *7-11, 2023 WL 2664078. Defendants do not identify any reason to disturb this decision, so Defendants collateral estoppel argument should be rejected based on the law of the case.

**B.    The Issues Are not Identical and Persaud was Deprived of the Opportunity to Fully and Fairly Litigate at OATH**

Plaintiff does not dispute that Defendants have reasonably described the framework used to analyze whether to apply collateral estoppel. (Def. Memo at 7-8). Plaintiff disputes, however, that collateral estoppel should apply because (1) the issues are not identical and (2) Defendants deprived Persaud of the opportunity to fairly litigate his case at OATH.

8

### 1.      The Issues Are Not Identical and Actually Decided

Collateral estoppel requires that the issues in the different proceedings be identical and "actually decided." <u>Matusick v. Erie County Water Auth.</u>, 757 F.3d 31, 45 (2d Cir. 2014). Here, Lieberman defined the only two issues to be addressed by OATH as: (1) "Were [the] comments posted to [Persaud's] account" and (2) "Did [Persaud] fail to cooperate with the Advocate's Office and/or EEO?" (DE #67-4 at 36). Indeed, the City argued at OATH that it did not matter whether Persaud or someone else authored the post, since Persaud owned his page and bore responsibility. (DE #67-12 at 73). Accordingly, the identity of the Facebook Post's author was not actually decided.

### 2.      Defendants Prohibited Persaud From Calling His Witnesses

Persaud did not have a full and fair opportunity to call witnesses at OATH. Persaud asked that the City have five specific witnesses in its control testify at the hearing. (DE #67-4 at 36-38). Lieberman essentially quashed the demand because he believed the witnesses were not "material." (DE #67-4 at 36; Lieberman 38).

Further, Persaud asked for the second trial date to be adjourned so that his father could be available to testify. (Ex. 2 at 2057). Persaud also expected that with additional time, his father would be able to locate the four alleged complainants about the Facebook Post, so they could testify. (Ex. 2 at 2057). The City objected to Persaud's adjournment request because the ALJ had already stated that the June 22nd date was "firm." (Ex. 2 at 2057). The trial date proceeded on the scheduled date, so Persaud was deprived of the opportunity to present evidence from those witnesses. (DE #67-11). Accordingly, collateral estoppel cannot be applied here because Persaud was deprived of the opportunity to have a full and fair hearing.

## II.     DEFENDANTS OVERTLY TOOK ADVERSE ACTIONS AGAINST PERSAUD BECAUSE OF A FACEBOOK POST WHICH IS PROTECTED SPEECH

The elements of a First Amendment retaliation claim arising in the workplace are: (A) plaintiff engaged in constitutionally protected speech because he spoke as a citizen on a matter of public concern; (B) he suffered an adverse employment action; and (C) the speech caused the adverse employment decision. Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006) (citing Gronowski v. Spencer, 424 F.3d 285, 292 (2d Cir. 2005)); Sheppard v. Beerman, 94 F.3d 823, 827 (2d. Cir. 1996). Defendants conflate many issues, so for clarity, below, Plaintiff addresses each of these elements.

### A.     Oil, Labor, and Democracy are Matters of Public Concern Unrelated to Persaud's Work at the DOF

For an employee's speech to be constitutionally protected, it must (1) relate to a matter of public concern and (2) not be spoken pursuant to the employee's job responsibilities, but rather as a citizen. Jackler v. Byrne, 658 F.3d 225, 237 (2d Cir. 2011). Matters which relate to a "political, social, or other concern to the community," constitute matters of public concern. Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009) (quotation omitted). Courts look to the "content, form, and context of a given statement" to determine whether it is a on a matter of public concern. Montero v. City of Yonkers, 890 F.3d 386, 399 (2d Cir. 2018).

Here, there can be no question that the Facebook Post is protected speech. Oil, labor, and democracies in the Western Hemisphere are all unquestionably matters of public concern which bear absolutely no relationship to Persaud's work reconciling City bank accounts for the DOF. To be sure, the Facebook Post was made in response to another social media post promoting a newspaper article which generated at least thirty-four comments from community members, and the "Gutter Work" article was about a social media response to the narrator's story. (DE #67-4 at

10

2, 27). In other words, it is self-evident that the Facebook Post is a matter of public concern. Accordingly, the protected speech element is satisfied.

Notably, even if all or part of the Facebook Post is considered provocative or outright bigoted or hateful (which it should not be), that does not automatically take the Facebook Post out of the scope of the First Amendment's protection. See Pappas v. Giuliani, 290 F.3d 143, 146 (2d Cir. 2002) (assuming, without deciding, that police officer's overtly bigoted "speech" was protected). Rather, it means only that the Court should move to the Pickering balancing test. Id.; See Point III, infra.

Defendants argue that their belief about whether or not the speech was protected is the dispositive legal issue, and that whether or not the speech is otherwise considered protected by the First Amendment does not matter. The law does not support this position.

Defendants suggest that support for this point is rooted in Waters v. Churchill, 511 U.S. 661 (1994). But, in no certain terms, Waters supports the proposition that a public employer can be liable for First Amendment retaliation even if it believed the conduct at issue was unprotected: "Government action based on protected speech may under some circumstances violate the First Amendment even if the government actor honestly believes the speech is unprotected." Id. at 669. The take-away from Waters is a test of reasonableness, meaning was the employer's decision about the speech's protection reasonable in light of the circumstances:

> We think employer decisionmaking will not be unduly burdened by having courts look to the facts as the employer reasonably found them to be. It may be unreasonable, for example, for the employer to come to a conclusion based on no evidence at all. Likewise, it may be unreasonable for an employer to act based on extremely weak evidence when strong evidence is clearly available -- if, for instance, an employee is accused of writing an improper letter to the editor, and instead of just reading the letter, the employer decides what it said based on unreliable hearsay.

Id. at 677.

Here, direct evidence exists that, despite their backtracking now, at the time, Defendants understood the speech was political, i.e. protected. In fact, Smith was told that the Facebook Post was "something having to do with Guyanese politics." (Smith 30). Accordingly, Defendants suggestion on this motion that they did not reasonably believe the Facebook Post was protected speech should be rejected out-of-hand.

But, if further inquiry into the reasonableness of Defendants' purported belief about the speech is required, a conclusion that the speech was not protected cannot reasonably be reached. As an initial matter, to the extent the Defendants are trying to parse out the "ghetto rats" comment from the rest of the Facebook Post to suggest that they acted solely on that statement, that is simply not true. The entirety of the Facebook Post was set forth in the charges and Lieberman admitted that he considered the context of the phrase, meaning the entirety of the Facebook Post. (Lieberman 16).

The totality of the circumstances shows that the Facebook Post was a response to the "Gutter Work" article and the political and societal implications of the rise of oil jobs in Guyana. It does not require a scholar of Guyanese politics to understand the point of the article and the posts made in response to it, including the Facebook Post.

Even isolating the "ghetto rats" phrase, however, leads to the same conclusion. In employment discrimination cases, employers distinguish cases where conduct is directed at an individual who happens to be in a protected class (which would not be unlawful discrimination), verse conduct which is directed at an individual because of that individual's membership in a protected class (conduct which could be unlawful discrimination). See e.g. Henek v. CSC Holdings, LLC, 449 F. Supp. 3d 35, 45 (E.D.N.Y. 2020) (citation omitted). Here, the

12

commentary was about workers who happen to be Guyanese. Indeed, the entire article was about Guyana. The comments were not directed at workers because they are Guyanese. In other words, the clear meaning of the post has nothing to do with disparaging people of Guyanese national origin, but is rather about workers in Guyana, in general. Marshall understood this interpretation of the article and Facebook Post. (Marshall 16-16; 22; 30-31).

Further, Lieberman and Soliman could not articulate any reason why "ghetto rats" would be a derogatory remark, Soliman testifying that "it seemed to be" derogatory and Lieberman having no idea whether or not it was derogatory. (Lieberman 14, 26; Soliman 14). Since Soliman and Lieberman could not articulate any reason why "ghetto rats" could be derogatory, they could not reasonably believe the speech was unprotected, even assuming that derogatory speech would be unprotected, per se.

Defendants argue that Lieberman and Marshall looked at "ghetto rats" to the exclusion of the rest of the Facebook Post. (Def. Memo at 11-12). This is not true, as set forth above. (Lieberman 16 (Lieberman testifying that he looked at material which provided "context" to the alleged offensive comments); See also Pl. Memo at 12 (noting that the entirety of the Facebook Post was used as support for the charges, not just the "ghetto rats" comments)).

But, if accepted as true that Lieberman and/or Marshall looked solely at the "ghetto rat" comment to the exclusion of all other evidence related to the Facebook Post, then their conclusion that the comment was unprotected is not reasonable, under Waters. 511 U.S. at 677 (excluding from consideration available evidence about the nature and context of the speech prohibits a finding of reasonableness).

Finally, Defendants point to Plaintiff's deposition testimony as an admission that "ghetto rats" is racially offensive. (Def. Memo at 12-13). To the extent that Plaintiff's beliefs about

Defendants' states of mind are probative, the beliefs were plainly formed based on what City officials told Persaud during the investigation. (E.g. DE #67-6 at 1 (Marshall directing EEO investigator Grant to tell Persaud that the Facebook Post is an "inappropriate characterization, relating to the race and or ethnicity of the group being referenced")). As discussed above, Defendants' purported beliefs are not only not reasonable, but are contradicted by the direct evidence that they knew the Facebook Post was political, a fact Persaud has always maintained. (Smith 30; DE #67-4 at 34 (Persaud's answer to the charges pointing out that the Facebook Post included the word "democracy")). As also noted, even if the Facebook Post is considered racially offensive, that does not compel the conclusion that it is not protected speech.

In sum, the Facebook Post, which concerns social and political commentary related to jobs in Guyana, is protected speech. To the extent it is appropriate to venture into the minds of the Defendants to determine whether or not they believed the speech was unprotected, a belief that the conduct was not protected is not reasonable under the circumstances and is not a supportable defense.

**B.     Opening an Investigation, Initiating charges, and Termination are Adverse Actions**

Defendants do not dispute that termination is an adverse action. But, initiating disciplinary charges against an employee which could lead to suspension – or worse – is also an adverse action, as is the opening of an investigation into protected speech. Broich v. Inc. Vill. of Southampton, 462 Fed. App'x 39, 47 (2d Cir. 2012) (citing Burkybile v. Bd. of Educ., 411 F.3d 306, 313-14 (2d Cir. 2005); Smith v. County of Suffolk, 776 F.3d 114, 123-24 (2d Cir. 2015). Here, Defendants opened an investigation concerning the Facebook Post, then served on Plaintiff a total of six disciplinary charges which not only could have led to suspension or termination, but

in fact did lead to termination. (DE #67-4 at 30-31). Accordingly, at least three adverse actions exist here (1) opening an investigation, (2) initiation of charges and (3) termination.

**C.      Defendants Charging Persaud for the Facebook Post is Direct Evidence of Retaliation, But Indirect Evidence Also Supports Causation**

First Amendment retaliation claims apply "but for" causation. Morales v. City of New York, 21-925-cv, 2022 U.S. App. LEXIS 20112, *3, 2022 WL 2840035 (2d Cir. July 21, 2022). Though "but for" is considered a stricter standard than the now retired motivating factor standard, a plaintiff need not show that retaliation was the only reason for an adverse action; rather, a plaintiff can show the adverse action would not have been taken absent the retaliatory motive. Kwan v. Andalex Group., 737 F.3d 834, 846 n.5 (2d Cir. 2013); See also Burrage v. United States, 571 U.S. 204, 213-18 (2014) (Justice Scalia discussing the meaning of but-for causation). Here, direct and indirect evidence, in its totality and individually, suggests that adverse actions were taken against Persaud because of the Facebook Post. As discussed below, the evidence includes timing, pursuing cumulative charges, and issuance of a penalty which deviates substantially from two non-parties' penalty recommendations.

Smith is instructive on the question of causation. 776 F.3d at 121. In Smith, the plaintiff-police officer used his work computer to communicate with a newspaper reporter. Id. at 117-18. The defendants charged Smith with conduct unbecoming a police officer based on his improperly using his work email, and for communicating with the media in a way which brought discredit to the police department. Id. at 118. The department also issued thirty-two other charges based on various violations of department rules. Id. The Second Circuit determined that the plaintiff offered "direct evidence" of retaliation: "The plain language of several of the disciplinary charges at the heart of the adverse actions directly implicates not only the fact that Smith had engaged in protected speech, but also the content of that speech." Id. at 121.

15

Here, as in <u>Smith</u>, disciplinary charges relate directly to the protected speech. In fact, four of the six charges are based on the Facebook Post and Specification 1 recites the Facebook Post in its entirety. (DE #67-10 at 6). Accordingly, direct evidence of retaliation exists.

But, this is not the extent of the evidence. The charges were issued just thirteen days after the Facebook Post. (DE #67-4 at 30-31; 56.1 ¶¶ 6, 34); <u>See also</u> <u>Persaud,</u> 2023 U.S. Dist. LEXIS 53182, at *12, 2023 WL 2664078 (noting that because "at least" four charges relate to the Facebook Post, and based on the timing of their issuance, an inference of retaliation is established). Thus, the timing supports an inference of retaliation.

Moreover, the ALJ noted that Charges IV and V are "cumulative," i.e. superfluous. (DE #67-11 at 9). In fact, just before the start of the hearing, Lieberman contacted the EEO to find out if its investigation was complete, because he wanted to add specifications concerning the Facebook Post to support the charges. (DE #67-4 at 33). A jury could infer from this piling on of specifications and charges that Defendants intended to punish Persaud for the speech.

Additionally, an independent "Informal Conference Leader" heard the charges on December 1, 2020. (DE #67-4 at 42). The Conference Leader recommended only a two-week suspension with a formal reprimand. (DE #67-4 at 44). Lieberman's office, however, prepared an "acceptance" of a recommended penalty form for the more severe penalty of termination, and asked Persaud to sign it, by which Persaud would thereby accept termination in lieu of a formal hearing. (DE #67-4 at 45; Lieberman 41-42). In other words, by replacing the issued recommendation of suspension with a penalty of termination, a jury could infer that Lieberman was intent on termination from the very beginning and, if a jury infers this, it could similarly infer an improper motive.

16

Furthermore, the independent Conference Leader and non-party Smith (an Assistant Commissioner for the DOF), both thought that a penalty less severe than termination was appropriate, with the Conference Leader supporting a penalty of only two weeks of suspension with a reprimand. (DE #67-4 at 44; Smith 6, 20-21)[1]. That Defendants sought and then implemented a much more severe penalty – termination – shows an improper motive.

Defendants argue that Persaud must show that the "employer's stated non-[retaliatory] reason is either false or inadequate." Def. Memo. at 14 (quoting Naumovski v. Norris, 934 F.3d 200, 215 (2d Cir. 2019) (alterations in the original)). Naumovski, however, is not a First Amendment retaliation case, it is an Equal Protection case. Naumovski, 934 F.3d at 211-12. Equal Protection claims are analyzed like Title VII claims, and therefore, Courts apply the familiar Title VII McDonnell-Douglas burden shifting analysis. Id. at 212-14.

McDonnell-Douglas, however, does not apply to First Amendment claims so First Amendment plaintiffs need not show the falsity of a business reason. Matusick, 757 F.3d at 47. Rather, once a plaintiff shows the elements of a First Amendment claim, a defendant can "demonstrate by a preponderance of the evidence that it would have undertaken the same adverse employment action even in the absence of the protected conduct." Id. (quotation omitted). Thus, the defendants bear the burden of proving they would have taken the adverse action absent the protected activity. Id.

---

[1]  Smith initially stated he could "support alternatives to dismissing" Persaud, but changed his mind, not because of anything related to the charges, but because he was concerned about Persaud's stress levels and concerns he heard from his staff. (Smith 23). In other words, Smith's testimony and e-mail show that an independent observer looking solely at the charges, did not believe that termination was warranted.

Defendants argue that they have met their burden on this question. (Def. Memo. at 15). They point to testimony which uses the magic words "but for" and testimony that Lieberman[2] considered the charge relating to Persaud's alleged lack of cooperation with the investigation as the "most egregious element of the misconduct." Id. But, questions of fact exist concerning whether Defendants would have taken the adverse actions absent the protected speech.

Again, Smith is instructive here. Smith involved the question of how to evaluate causation when an adverse action includes disciplinary charges which touch both on protected conduct and unprotected conduct, the situation presented here. Smith, 776 F.3d at 122. The Second Circuit directs that to grant summary judgment to a defendant in such cases, a District Court must be able to conclude that, viewing the record in a light most favorable for the plaintiff, "a reasonable jury must conclude by a preponderance of the evidence that the [defendants] would have taken these adverse actions absent" the protected conduct. Id. at 124 (emphasis added). Here, the record prevents such a finding.

For starters, Soliman testified that the "EEO matter" was the reason he terminated Persaud and that he was aware of "no other reasons" for the decision. (Soliman 10-11). The "EEO matter" concerned only the Facebook Post. (DE #67-8 at 1-4).[3] Accordingly, straight from the final decision maker's mouth is an admission that but-for the subject matter of the EEO investigation – the Facebook Post – he would not have terminated Persaud.

---

[2]   Lieberman is a lawyer so it is not surprising that he understood the significance of using such magic words in a deposition related to an action in which he is a defendant. (Lieberman 52).

[3]   The EEO report alleges that Persaud did not "cooperate," but the ultimate conclusion and recommendation of the report concerned only the Facebook Post and made no recommendation or conclusion concerning the "cooperation."

Similarly, Marshall admitted that the sole reason he opened his investigation was the Facebook Post. (Marshall 11). Thus, the Facebook Post was the "but for" (and only) reason for the EEO investigation. And, notably, absent the protected conduct, the investigation never would have opened and Defendants would not have had the opportunity to charge Persaud for not participating in the investigation.

Other evidence shows issues of fact exist concerning whether Defendants would have taken the same termination action absent the protected conduct. At least two non-parties believed the totality of the charges, including the protected and unprotected conduct, did not warrant termination. The Informal Conference Leader thought only a two-week suspension with reprimand was appropriate and Assistant Commissioner Smith was prepared to advocate for a penalty less severe than termination, until he heard other information wholly unrelated to any of the charges. (DE #67-4 at 44; Smith 6, 20-21). That Defendants sought and implemented such a drastically more brutal penalty suggests an unlawful motivation, and that they would not have terminated Persaud absent animus derived from the protected speech.

Additionally, just before the hearing, Lieberman affirmatively ventured to include charges related to the EEO's findings. (DE #67-4 at 33; Lieberman 30-31). This shows Lieberman's intent to punish Persaud for the protected speech. The desire to include the EEO's findings to the specifications also suggests that Lieberman was unsure about whether the charges, as originally formulated, were strong enough to support a termination, so he sought to include anything and everything he could to ensure his pre-determined outcome of termination would be secured. (See DE #67-4 at 33; Lieberman 30-31).

19

Based on the totality of these circumstances, it is not certain that a jury could conclude only that Defendants would have taken the adverse actions absent the protected conduct, so summary judgment cannot be granted on this point.

Defendants further argue that Heffernan v. City of Paterson, 578 U.S. 266 (2016), alters the causation element requiring a plaintiff to show that the Defendants had an improper motive for the adverse action. Preliminarily, Heffernan is a "perceived" First Amendment case, meaning Heffernan extends First Amendment protection to situations where the employee did not actually engage in First Amendment activity, but the defendants believed he did. Heffernan, 578 U.S. at 273. As pled, this is a Heffernan "perceived" case because Plaintiff alleges his father, not he, posted the Facebook Post.

But, Defendants argue that Plaintiff is collaterally estopped from arguing that he did not author the Facebook Post and that this Court must accept as a fact that "Plaintiff authored and posted the offending Facebook comments." (Def. Memo at 8). Accordingly, if the Court is persuaded to apply collateral estoppel to this fact, then the case is no longer a perceived case and Heffernan (and any heightened causation standard it stands for) does not apply, so the Court can analyze the First Amendment claim as it would any traditional First Amendment case, as set forth above.

If the Court rejects the collateral estoppel argument and applies Heffernan, then Heffernan does not alter the outcome. As shown above, Defendants knew the speech was political, they opened an investigation against Persaud overtly because of that protected speech, they issued charges against him directly because of the speech, then they terminated him because of the speech. Accordingly, any additional showing of intent compelled by Heffernan is met here.

20

### III.  PERSAUD'S INTEREST IN MAKING THE SPEECH FAR OUTWEIGHS ANY INTEREST THE CITY HAS IN REGULATING THE SPEECH

Using the Pickering defense, defendants must "demonstrate by a preponderance of the evidence that [the public employee's] speech was likely to disrupt the government's activities [and that] the likely disruption was 'sufficient to outweigh the First Amendment value of [the public employee's] speech.'" Gusler v. City of Long Beach, 715 Fed. App'x 68, 70 (2d Cir. 2018) (alterations in the original) (quotations omitted). Notably, "the Pickering balance is more likely to favor the government when an employee directly confronts his supervisor with objectionable language than when an employee engages in equivalent speech on his own time and not in front of co-workers." Lewis v. Cohen, 165 F.3d 154, 162 (2d Cir. 1999) (quotations omitted). Along with the factors identified by Defendants (Def. Memo. at 19), Courts should consider the "manner, time and place" of the speech, and the nature of the employee's responsibilities. Id. "Where . . . an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal." Rankin v. McPherson, 483 U.S. 378, 390-91 (1987).

Preliminarily, the Pickering inquiry relates only to the speech, thus Defendants' argument that the alleged failure to cooperate with the investigation factors into the Pickering inquiry is misplaced. That "fact" is not a part of the Pickering analysis. See e.g. Jackler, 658 F.3d at 237 (Pickering concerns a "delicate balancing of the competing interests surrounding the speech and its consequences," and does not apply to conduct which is not protected (citations omitted) (emphasis added)).

Turning to the factors, Defendants cannot meet their burden on this motion. The protected speech was made outside of work and was not directed to supervisors or co-workers. Rather, the speech was made exactly where such political speech might be expected to be made – in a social

media forum where the original publisher posted a provocative newspaper article, likely for the very purpose of promoting lively community debate on the issue presented in the article.

Persaud was not a high-ranking policymaker nor did he interact with members of the public. Persaud was essentially a "worker bee" whose responsibilities were primarily internal – reconciling bank accounts and reviewing employee timesheets. The speech did not and could not in any way impair harmony between Persaud and his supervisors and co-workers, it could not and did not have a detrimental effect on close working relationships, and it did not and could not have interfered with Persaud's work responsibilities or the "operation of the enterprise." In other words, Defendants have no remarkable interest in regulating the speech.

On the other hand, the importance of the speech is great. The questions posed by "Gutter Work" – which segments of the Guyanese population should work the new oil jobs – are significant. Indeed, "Gutter Work" was not necessarily a story about the "young man" from the "ghetto." Rather, "Gutter Work" took interest in the "responses which his story attracted." (DE #67-13 at 138). In other words, "Gutter Work" was an article about why the narrator's story was a matter of public and social concern. The Facebook Post's contribution to this public dialogue deserves the highest degree of First Amendment protection and outweighs any interest DOF may have in regulating the speech. Accordingly, the <u>Pickering</u> test weighs in favor of Persaud.

## IV.   THE CITY IS LIABLE BECAUSE A FINAL POLICYMAKER MADE THE TERMINATION DECISION

Under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690-91 (1978), a municipality may be liable for its employees' constitutional violations where its policy, custom, or practice caused the deprivation of rights.  <u>Lehal v. Central Falls Detention Facility Corp.</u>, 13cv3923, 2016 U.S. Dist. LEXIS 177587, *20-21 (S.D.N.Y. Nov. 21, 2016). "When an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent

government policy.'" <u>Nagle v. Marron</u>, 663 F.3d 100, 116 (2d Cir. 2011) (quotations omitted). If an official's decisions for "practical or logical reasons constitute the municipality's final decisions," then the official is a policymaker. <u>Rookard v. Health and Hosp. Corp.</u>, 710 F.2d 41, 45 (2d Cir. 1983).

Here, Soliman, as Commissioner of the DOF, had final authority concerning the employment decisions underlying the claims. Soliman testified that (1) "the decision to terminate an employee is a power vested within an agency head"; (2) neither the mayor nor the City Council had to approve Persaud's termination; and (3) he made the decision to terminate Persaud. (Soliman 9-11; DE #67-15 at 2). Further, Soliman reviewed, approved, and adopted the EEO investigation report which caused charges to be filed against Persaud. (DE #67-8 at 4). Accordingly, practically, logically, and technically, Soliman's decisions constitute the decisions of the City, so the City is liable pursuant to <u>Monell</u>.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests an order denying Defendants' motion for summary judgment in its entirety.

Dated: Melville, New York
      February 5, 2024

<div style="margin-left:40%">

Respectfully submitted,

 FAMIGHETTI & WEINICK, PLLC
*Attorneys for Plaintiff*
25 Melville Park Road, Suite 235
Melville, New York 11747
(631) 352-0050
By:    /s/ Matthew Weinick
      MATTHEW WEINICK

</div>

23