UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEVANAND PERSAUD,

                       Plaintiff,

-against-

CITY OF NEW YORK et al.,

                       Defendants.

22-cv-2919 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

**BACKGROUND**

Plaintiff Devanand Persaud worked for the New York City Department of Finance (DOF) for nearly five years before he was fired. Dkt. 70 ¶ 2. He says he was fired because of his speech. Compl. ¶ 90, Dkt. 1. So he has sued Defendants New York City and three of the DOF's top brass for First Amendment retaliation under 42 U.S.C. § 1983. *Id.* ¶¶ 91–93. Defendants have moved for summary judgment.

This case stems from a Facebook comment. Persaud is Guyanese, and he commented on a Guyanese newspaper's Facebook post that linked to one of its articles. *Id.* ¶ 9; Dkt. 70 ¶¶ 4–6.[1] The article was titled "Gutter work." Dkt. 70 ¶ 4; Dkt. 67-13 at 138. It recounted and commented on an "interesting story [that had] appeared on social media." Dkt. 67-13 at 138. In that story, "a young man who said he was from the ghetto" was "approached by a person who offered him a job of cleaning gutters. He considered the offer disrespectful. After all, according to him, Guyana is now an oil producer and he wanted to know why the ghetto youths should not be getting jobs pumping oil." *Id.* "[M]ost interesting," according to the article, was "not his narration of the incident, … but rather the responses which his story attracted." *Id.*

The article laid out the two sides: One set of responses "said the offer typifies how some view the ghetto—as being fit only for certain types of work and how making these offers would not … help to elevate people in the ghetto." *Id.* "The second set of responses was to the effect that there is nothing wrong with doing … manual labour such as cleaning gutters." *Id.* "The two sets of responses typify two approaches to work in Guyana." *Id.* The article then commented on the balance between a job's prestige and pay while canvassing various jobs available in Guyana.

---

[1] There is some dispute over whether *he* commented. Persaud says it was actually his dad who posted the comment through Persaud's account. Dkt. 70 ¶ 7. Persaud has no evidence of that beyond his say-so. *Id.* Regardless, Persaud agrees that the true speaker's identity doesn't change the legal analysis for this motion. *See* Dkt. 68 at 20; *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016) (holding that an employee may sue for First Amendment retaliation even if the employee didn't in fact engage in protected speech). So the Court will simply refer to the comment as his speech.

*Id.* It concluded by noting that the issue "boils down to one's philosophy of work," but, ultimately, "[a]ll work should be valued[,] whether it is cleaning the gutter or pumping oil." *Id.*

Persaud commented on the Facebook post from his personal account, "where he identifies himself by name and discloses his professional affiliation with the DOF." Dkt. 70 ¶ 3. He staked out a third, less optimistic, and more insulting position:

> That is [the] only work suitable for those ghetto rats! Oil jobs are for decent, hardworking, respectable people who vote for democracy and progress! The oil money belongs to supporters of democracy!
>
> Those who didn't vote democracy on March 2, 2020 elections should not get one cent of benefit from oil wealth or oil jobs!
>
> Let those ghetto rats go to Granger and Harmon for jobs!

Dkt. 67-13 at 144.

Defendants say the DOF's webmaster got "four complaints from members of the public" about Persaud's comment. Dkt. 70 ¶ 8. The complainants seem to have been living in Guyana: When the webmaster replied to one of the messages and noted that each complainant "used the same exact graphic," the complainant responded, "We have been trying our best to clamp down on this sort of behaviour across the board so locally our citizens have been on high alert for these sort of derogatory remarks and we've been letting persons know that whether the[y] are based here or abroad, we will NOT condone it." Dkt. 67-13 at 7. The rest of the complaints simply sent a screenshot of Persaud's comment accompanied by a short message or no message at all. *See id.* at 3–24.

The comment was ultimately brought to the attention of both the DOF's Department Advocate (one of its top lawyers) and the DOF's Equal Employment and Opportunity (EEO) Office. ¶ 9. The EEO Office opened an investigation. *Id.* It sent Persaud a Notice of Investigation and told him to contact the Office within three days. ¶ 15. When he failed to do so, the Office told him that his cooperation was "required" and that if he didn't participate, "the matter will be reviewed without your input." ¶ 16. How exactly Persaud responded is disputed, but he ultimately didn't sit for an interview or provide a written account of his side of the story. ¶ 17.

A few months later, the Office issued its final report. ¶ 22. It found that Persaud "engaged in misconduct by posting derogatory comments relating to the protected category of national origin." *Id.* It also "recommended that the matter be referred to the DOF's Department Advocate for further action." *Id.* The Department Advocate's office told Persaud (several times) that he needed to "appear and testify" about a "confidential, non-public disciplinary matter." ¶¶ 28–30. Persaud eventually responded, saying he would "NOT be participating" in any investigation unless it involved "misconduct … in performance of [his] official duties." Dkt. 67-13 at 114 (emphasis omitted).

Persaud kept his word, never appearing or testifying for the Department Advocate's investigation. Dkt. 70 ¶ 32. The Department Advocate then filed six disciplinary charges against Per-

2

saud. ¶ 34. Based on his Facebook comment, Persaud was charged with violating the DOF's code of conduct by (1) "perform[ing] an act … that might arouse hatred … on the basis of" race or national origin (among other categories), (2) "engaging in conduct that is likely to bring the City or agency into disrepute," (3) "engaging in conduct that was prejudicial to good order and discipline," and (4) violating the DOF's social-media policy. Dkt. 67-10 at 6–7. The two other charges were based on Persaud's failure to cooperate with the investigation. *Id.*

The charges were then heard by a state administrative-law judge (ALJ). Dkt. 70 ¶ 49. Persaud again declined to testify, but he "presented documentary evidence" and (because he chose to represent himself) cross-examined the DOF's witnesses. ¶¶ 50–51. The ALJ ruled for the DOF on all six charges and recommended firing Persaud. ¶ 53. The recommendation was sent to the Commissioner of the DOF, who accepted the recommendation and fired Persaud. ¶¶ 54–57.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–26 (1986).

## DISCUSSION

### I. The retaliation claim survives

"To survive summary judgment on a First Amendment retaliation claim, a public employee must establish a prima facie case by bringing forth evidence showing that (1) he has engaged in protected First Amendment activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (cleaned up).

"Once the plaintiff makes out a prima facie retaliation claim, a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense." *Id.* at 119 (internal quotation marks omitted). The government has a defense if it (a) would have taken the adverse action "even in the absence of the protected conduct" (under *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977)) or (b) justifiably took the action because the speech's disruption outweighed the speaker's interest (under *Pickering v. Board of Education*, 391 U.S. 563 (1968)). *Id.*

#### A. Persaud engaged in protected First Amendment activity

"The first prong—whether an employee's speech was entitled to First Amendment protection from retaliation—requires a two-part inquiry." *Barzilay v. City of New York*, 610 F. Supp. 3d

3

544, 574 (S.D.N.Y. 2022) (footnote omitted). "[T]he First Amendment protects speech uttered by an employee [1] in his or her capacity as a citizen [2] regarding a matter of public concern." *Smith*, 776 F.3d at 118; *see also Barzilay*, 610 F. Supp. 3d at 574–76. Here, Defendants don't contest that Persaud was speaking in his personal capacity. But they do argue that the speech was not on matters of public concern. This argument fails.

"Whether an employee's speech addresses a matter of public concern" is a question of law, "determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 & n.7 (1983). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up). The target audience may be "narrow" so long as the speech "addresses *matters* that concern the public." *Heim v. Daniel*, 81 F.4th 212, 228 (2d Cir. 2023) (citation omitted).

The speech here easily clears this bar. Persaud expressed his views on labor, economic development, democracy, and class in Guyana. To be sure, he expressed them caustically. But the "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987). And though Defendants try to isolate "ghetto rats," the statement must be taken in context. *Connick*, 461 U.S. at 147–48. Nor does Persaud's focus on a foreign country make a difference. *See Boos v. Barry*, 485 U.S. 312, 318 (1988) (describing domestic protests of foreign governments as "classically political speech"). So Persaud's "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick*, 461 U.S. at 145.

Defendants don't fight this reasoning. Instead, they argue that Persaud's speech was unprotected because "Defendants had a good-faith belief that [the speech] w[as] constitutionally unprotected." Dkt. 65 at 13 (emphasis omitted). This argument seems too good to be true, and indeed it is. Defendants rely on *Waters v. Churchill*, 511 U.S. 661 (1994), and *Heffernan v. City of Paterson*, 578 U.S. 266 (2016). But neither case says an employer can get away with a mistake of First Amendment law.

Rather, both cases were about an employer's mistake of fact. *Waters* "decide[d] whether [*Pickering* balancing] should be applied to what the government employer thought was said, or to what the trier of fact ultimately determines to have been said." 511 U.S. at 664 (plurality opinion). It held that the employer must make a "reasonable" investigation, and then a court should evaluate the speech as the employer reasonably believed it to be. *Id.* at 678–79. That understanding of *Waters* was repeated in *Heffernan*, which held "that, as in *Waters*, the government's reason for demoting [the employee] is what counts … even if … the employer makes a factual mistake about the employee's behavior." 578 U.S. at 273.

*Waters* and *Heffernan* make a difference in cases like the following: Employee A and Employee B have a conversation in the workplace. Employee B reports the conversation to their

4

employer but leaves out some critical details. As a legal matter, what Employee A *actually* said is constitutionally protected, but the speech that Employee B *reported* is not. After a reasonable investigation, the employer mistakenly (but reasonably) believes Employee B's account. *Waters* and *Heffernan* hold that the relevant unit of analysis for a retaliation suit is what the employer reasonably understood the speech to be (Employee B's account in the example above); the factfinder does not separately determine what was actually said. *See Washington v. Nat'l R.R. Passenger Corp.*, 2003 WL 22126544, at *5 (S.D.N.Y. Sept. 12, 2003) ("The Supreme Court has directed that where there is a dispute regarding such things as 'what the speech was, in what tone it was delivered, [or] what the listener's reactions were,' a court is to accept 'the facts as the employer reasonably found them to be.'" (quoting *Waters*, 511 U.S. at 677 (plurality opinion)).

Here, by contrast, there is no question about what was said. Persaud's comment is in writing and undisputed. The only questions are whether Defendants fired Persaud because of the speech and, if so, whether they were justified in doing so. *Waters* and *Heffernan* don't apply to a situation like this one.

### B. Persaud suffered adverse actions

Next, Persaud must show an adverse employment action. "For purposes of the First Amendment, an adverse employment action is one that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Specht v. City of New York*, 15 F.4th 594, 604 (2d Cir. 2021) (cleaned up). Here, Persaud claims there were three adverse actions: investigating, charging, and firing. Defendants don't address this element at all. So for purposes of this motion, the Court will accept that the investigation, charges, and firing are each independent adverse actions.

### C. Persaud has made a prima facie showing of causation

The last element is causation. "To show causation, a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Heim*, 81 F.4th at 222 (internal quotation marks omitted). "For a number of retaliation claims, establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward. Indeed, some of [the Supreme Court's] cases in the public employment context have simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other, shifting the burden to the defendant to show he would have taken the challenged action even without the impermissible motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal quotation marks omitted).

Here, Persaud's theory of causation is straightforward. "The plain language of several of the disciplinary charges at the heart of the adverse actions directly implicates not only the fact that [Persaud] had engaged in protected speech, but also the content of that speech." *Smith*, 776 F.3d at 121. "Those charges state that" Persaud spoke "in a manner tending to bring discredit to the [DOF]. The Department thereby both characterized the content of the speech and cited that characterization as the basis for several disciplinary charges." *Id.* (citations omitted) And the ALJ's decision recommending termination recited these charges and the DOF's policies. *See* Dkt. 67-11

at 2. That is "direct evidence" from which "a reasonable juror could conclude that the [DOF's] actions were motivated, at least in part, by a retaliatory animus." *Smith*, 776 F.3d at 121–22. Because the Court holds Persaud's "direct evidence of retaliatory intent sufficient to survive summary judgment, [it] [need] not pass upon the sufficiency of his indirect evidence." *Id.* at 121 n.3.

### D. Genuine disputes of material fact underlie the *Mount Healthy* defense

"[Persaud] having presented a prima facie case of First Amendment retaliation, [the Court] now turn[s] to whether defendants are nonetheless entitled to summary judgment in their favor by showing that the Department would have taken the same adverse actions in the absence of the protected speech." *Id.* at 122 (cleaned up). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 139 S. Ct. at 1722. "The operative question is whether defendants have demonstrated that a reasonable jury would have to find by a preponderance of the evidence that the [DOF] would have investigated," charged, and fired Persaud "absent his … speech." *Smith*, 776 F.3d at 122.

Defendants argue that the charges and firing were products of Persaud's refusal to cooperate with the investigation, not his speech. Yet the investigation was prompted by the complaints reacting to his speech. And the matter was referred to the Department Advocate for charges because the investigation found that Persaud had "engaged in misconduct by posting derogatory comments." Dkt. 70 ¶ 22. The fact that the whole process was kicked off by the investigation into his speech might be enough to conclude that the speech was a but-for cause of the charges and firing too. That is, if not for the investigation, Persaud never would've had the chance to not cooperate. So the failure to cooperate was not "misconduct that is separate and distinct from the incidents of speech," and the "disciplinary wheels were [not] in motion before the Department ever learned about [Persaud's] protected speech." *Smith*, 776 F.3d at 123–24. The parties simply haven't addressed whether that connection is a sufficient "chain of causation," *Hartman v. Moore*, 547 U.S. 250, 259 (2006), or whether Persaud's failure to cooperate is a "superseding cause, breaking the causal chain," *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017); *see also Taylor v. Ways*, 999 F.3d 478, 488 n.4 (7th Cir. 2021) (collecting cases).

In any event, the charges themselves reveal mixed motives, listing both the speech and failure to cooperate. And the evidence Defendants produce to break that tie is not exactly showstopping. They rely largely on their own statements. *See* Dkt. 65 at 15–16. For example, the Department Advocate testified that Persaud "would not have been terminated, but for his failure to engage." Dkt. 67-3 at 31:21–22. But "a plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability…. The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts[.]" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 n.5 (2d Cir. 2013). Not to mention, whether to credit a defendant's self-interested, on-the-nose testimony is up to the jury.

Defendants also point out that the charges were drafted on the day Persaud refused to appear (which Persaud disputes). Dkt. 70 ¶¶ 34–35. But that date was only thirteen days after his speech, the investigation was prompted by his speech, and the charges were mostly about his speech. *See Smith*, 776 F.3d at 124. Although many cases look to timing when a defendant's motives are unclear, there were two explicit, close-in-time motives here. The only question is whether the impermissible motive was a but-for cause. That is disputed.

"Put simply, the evidence of record … permits only inferences. Those inferences may be drawn [by the jury] in either party's favor, and [the law] require[s] more than inferences from an employer seeking summary judgment based on the *Mount Healthy* defense." *Id.* at 125. So Defendants have failed to carry their burden on this defense at this stage.

### E. Genuine disputes of material fact underlie the *Pickering* defense

"The government can also avoid liability under what is commonly referred to as the *Pickering* balancing test. Under this defense, a government employer may take an adverse employment action against a public employee for speech on matters of public concern if: (1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011) (cleaned up). In other words, assuming that Persaud's speech was the basis for the adverse actions, *Pickering* asks whether the government was justified.

"As a general rule, the application of the balancing test is a question of law which is properly performed by the district court." *Gorman-Bakos v. Cornell Co-op Extension*, 252 F.3d 545, 557 (2d Cir. 2001). But when, "[a]mong other items, the parties disagree as to … whether the … speech disrupted, or had the potential to disrupt, the [employer's] functioning" and whether "plaintiffs were in fact not dismissed because of the disruption, but because of the content of their speech," then those questions are "to be answered by the jury prior to the court's application of the *Pickering* balancing test." *Id.* (citation omitted). "Accordingly, after these underlying factual disputes are decided by a factfinder, the district court should consider the factual findings to come to its own legal conclusions about whether the employer's interest in efficiency or the employee's interest in free speech is paramount." *Id.* at 558.

Here, genuine disputes of material fact underlie both the DOF's prediction of disruption and whether the DOF took the adverse actions because of those predictions. So the Court need not balance the interests on this motion.

#### 1. *The government's interest*

In evaluating the government's interest, the Supreme Court has "recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the

7

regular operation of the enterprise." *Rankin*, 483 U.S. at 388. "[T]he manner, time, and place of the employee's expression are [also] relevant." *Id.* At bottom, the government's core interest as employer is in the "efficiency and effectiveness [of] government service." *Heffernan*, 578 U.S. at 270 (cleaned up).

"[T]he disruption need not be actual; the Government may legitimately respond to a reasonable prediction of disruption." *Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006). And courts do give some "deference to government predictions of harm used to justify restriction of employee speech." *Waters*, 511 U.S. at 673 (plurality opinion). Yet even when the employer has "special expertise …, the deference to their conclusions has never been complete." *Id.* at 677. And "the government has the burden to show that the employee's activity is disruptive to the internal operations of the governmental unit in question." *Melzer v. Bd. of Educ.*, 336 F.3d 185, 197 (2d Cir. 2003).

Here, Defendants rely on predicted disruption. But they don't argue that Persaud's statement would affect discipline by superiors,[2] that his job involves loyalty or confidence, or that the statement interferes with his ability to do his job. Instead, they rely on coworker harmony and the DOF's operations. Defendants assert that Persaud's job "required him to work collaborative[ly] with his co-workers" and was "public facing." Dkt. 65 at 21. They also point to several cases emphasizing the need for the "appearance of impartiality," arguing that Persaud's comment "risked creating the impression that members of racial minorities might not receive adequate services due to racial hostility." *Id.* at 19, 21 (citation omitted). And on manner, time, and place, Defendants note that the statement was made harshly, publicly, and during work hours.

"There is reason to question whether the employer's prediction of the disruption that [Persaud's speech] will cause is reasonable." *Barzilay*, 610 F. Supp. 3d at 600 (internal quotation marks omitted). At this stage, it suffices to say that Defendants' account is genuinely disputed. On the coworker point, there is no evidence that any coworkers saw the post, let alone reacted to it. Although the Court respects Defendants' predictions, they have no evidence of or arguments for potential disharmony beyond their say-so. They haven't shown that Persaud was Facebook friends with coworkers, that his profile was public, that similar situations in the past have caused disruption, or anything similar. And though "ghetto rats" could certainly offend some, it's not obvious that Persaud's acerbic take on Guyanese political economy would pique the DOF's accountants. *Cf. Bennett v. Metro. Gov't*, 977 F.3d 530, 540 (6th Cir. 2020) (case in which the jury was asked whether the employee's "Facebook comment [using a racial slur] was reasonably likely to have a detrimental impact on close working relationships" in her workplace (emphasis omitted)).

As for public perception, Defendants' only evidence is the four "complaints." As noted, it's unclear who the complainants were, but the little available evidence suggests that they were not

---

[2] Defendants briefly mention that permitting Persaud to defy the investigation would harm discipline. But that framing conflates the *Mount Healthy* and *Pickering* defenses. The question here is whether the speech itself would interfere with discipline.

8

going to request the DOF's services any time soon. And though Defendants' charges and briefs are focused on potential perceptions of ethnic or racial bias, that take on Persaud's comment is not reasonable. Everyone mentioned in the article is Guyanese, and there is no mention of race. Disparaging people on the basis of class or other background characteristics could also matter, but Defendants haven't made that argument on this motion.

Nor is there much reason to think that Persaud's comment would meaningfully reflect on the DOF. True, he listed his affiliation on his Facebook page. But again, Defendants haven't produced any evidence about the reach of Persaud's comment. And his job's "public facing" elements didn't really face the "public." Defendants say Persaud worked with "bank officials" and "outside auditors." Dkt. 65 at 21. Those people are hardly the kind to be scared off—they have to work with the DOF. As Persaud puts it, his main work was "reconciling bank accounts and reviewing employee timesheets." Dkt. 68 at 22. At the very least, the evidence does not clearly show that the government's interest is more than "minimal":

> [I]n weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where, as here, an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal.

*Rankin*, 483 U.S. at 390–91.

Similarly, the cases about the "appearance of impartiality" are inapt. In fact, they provide a useful foil. Those cases involved "the unique relationship between a police department and the public it serves." *Locurto*, 447 F.3d at 178. Persaud's role as a DOF accountant is a far cry from a police officer, perhaps the most public-facing job in government and the one where real or perceived bias can be most harmful. *See id.* The other cases Defendants cite also involve more disruption, jobs that are more public-facing, or both. *See Bennett*, 977 F.3d at 540–41 (911 operator whose use of a racial slur on Facebook "prompted a 'nonstop conversation' in the office that lasted for days" and caused her coworkers to lose trust in her judgment); *McCullars v. Maloy*, 369 F. Supp. 3d 1230, 1240–41 (M.D. Fla. 2019) (court clerk whose criticism of the state attorney on Facebook caused "public outcry" that was "immediate and overwhelming"); *Finn v. N.Y. State Off. of Mental Health-Rockland Psychiatric Ctr.*, 2011 WL 4639827, at *21 (S.D.N.Y. Oct. 6, 2011) (food-service worker who posted "threatening, rude, and offensive" flyers in his workplace), *aff'd*, 489 F. App'x 513 (2d Cir. 2012).

Finally, the manner, time, and place arguments don't do much to move the needle. Although harshness and publicity might increase the risk of disruption, they are not enough on their own. And the work-hours argument doesn't make a difference because Defendants haven't presented any evidence linking the time of a social-media post to its effect on the workplace or public perception of the post.

Viewing the record in the light most favorable to Persaud, "Defendants are not entitled to take advantage of the *Pickering* defense at this juncture, and a jury should have the opportunity to resolve whether their concern about disruption was reasonable." *Barzilay*, 610 F. Supp. 3d at 601 (internal quotation marks omitted).

### 2. *The government's motivation*

The defense fails for another reason too. Because Defendants focused on the *Mount Healthy* defense (and, to some extent, conflated it with the *Pickering* defense) in their briefs, they cited little to no evidence that Defendants were motivated by the risk of disruption. Instead, they put nearly all of their eggs in the failure-to-cooperate basket. So "even if the potential disruption to the office outweighs the value of the speech," Defendants have not shown that Persaud was fired "only *because of* the potential disruption, and *not because of* the speech. That is to say, it matters not that the potential disruption outweighs the value of the speech if the employer subjectively makes the speech the basis of his termination decision: such 'retaliatory' discharge is always unconstitutional." *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir. 1996).

## II. The *Monell* claim survives

### A. The City's official policies were the moving force behind the individual defendants' actions

Defendants also say that even if the individual defendants can be held liable, the City cannot. To hold the City liable for a constitutional tort under § 1983, the "execution of [the City's] policy or custom" must "inflict[] the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "'[L]ocal governing bodies [like the City of New York] can be sued directly' (1) when 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers' or (2) for 'constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Bernshtein v. City of New York*, 496 F. App'x 140, 144 (2d Cir. 2012) (alterations in original) (quoting *Monell*, 436 U.S. at 690–91). In other words, "a plaintiff must demonstrate that through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (citation omitted).

Here, the DOF's code of conduct and social-media policy are formal policies.[3] *See* Dkt. 70 ¶¶ 24–25; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986) ("To be sure, 'official policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time."); *Lopez v. Bay Shore Union Free Sch. Dist.*, 668 F.

---

[3] The parties don't address this issue, but it seems that claims based on the DOF's policies are properly brought against the City. *See Bey v. City of N.Y. Dep't of Fin.*, 2012 WL 441258, at *2 (E.D.N.Y. Feb. 10, 2012). Similarly, the City doesn't challenge that the DOF's policies are the City's policies.

10

Supp. 2d 406, 417 (E.D.N.Y. 2009) ("[T]he actual policies of the [defendant], including the defendant's code of conduct …, necessarily form the basis for potential *Monell* liability.").

And as noted, Persaud's firing was the result of "implement[ing] or execut[ing]" the City's policy. *Monell*, 436 U.S. at 690; see Dkt. 67-10 at 6–7. Although the policies don't require an employee's firing, the City doesn't argue that this fact sufficiently dilutes the policy's role as the "moving force" behind the firing. So to the extent that there are genuine disputes over the underlying retaliation claim, there are also genuine disputes preventing summary judgment over whether a "municipal policy … cause[d] [Persaud] to be subject to … the deprivation of a constitutional right." *Agosto*, 982 F.3d at 97.

### B. Confusion over what *Monell* requires

#### 1. Final policymaker

Defendants make three arguments in response. The first two reflect some confusion about what *Monell* requires. First, they say Persaud was not fired by a final policymaker. And it's true that the "Supreme Court has said that a municipality may be liable for the acts of a single official—but only if that official is someone whose edicts or acts may fairly be said to represent official policy for the entire municipality." *Agosto*, 982 F.3d at 98. Recent, thoughtful opinions in this district have come out differently as to whether the head of a municipal agency is acting as a "policymaker" when she fires an employee. *Compare Barzilay*, 610 F. Supp. 3d at 618–19, *with Buchanan v. City of New York*, 556 F. Supp. 3d 346, 362–64 (S.D.N.Y. 2021). Fortunately, the Court need not address that question; identifying a policymaker's direct involvement is sufficient, not necessary. Indeed, the policymaker-ratification theory is typically a backup for situations where, unlike here, there is no official, written policy. *See, e.g.*, *Agosto*, 982 F.3d at 98 ("Rather than argue that there is a written municipal policy … [the plaintiff] pursues *Monell* liability on the theory that [the defendant's] individual actions represent official policy for the entire Department[.]" (cleaned up)). (And as noted above, the City doesn't contest that the policies here are official policies formulated by a policymaker.)

#### 2. "Unconstitutional" policies and "single incidents"

Second, they say there is no "evidence that the DOF's code of conduct or its social-media policy are themselves unconstitutional" and that a "single incident of unconstitutional activity is not sufficient." Dkt. 75 at 2 (internal quotation marks omitted). These arguments are misguided.

Start at the beginning. *Monell* held that a municipality counts as a "person" under § 1983. 436 U.S. at 691–92. So a municipality is liable if, "under color of some official policy," it "subject[s], or cause[s] to be subjected, any person … to the deprivation of any rights … secured by the Constitution." *Id.* (internal quotation marks omitted). *Monell* ruled out the municipality's liability as an employer, or a "*respondeat superior* theory." *Id.* at 691. That is, it must be the municipality's choices (as manifested through its policies and policymakers) that "inflict[] the injury" rather than its employees' mere "accidents." *Id.* at 693–94.

11

Here, the City relies on one of *Monell*'s progeny, *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). *Tuttle* involved a plaintiff seeking to hold a municipality "liable for a 'policy' of 'inadequate training' based merely upon evidence of a single incident of unconstitutional activity," one use of excessive force. *Id.* at 813 (plurality opinion); *see also id.* at 814 n.2 ("The actual 'question presented' in the petition for certiorari is: 'Whether a single isolated incident of the use of excessive force by a police officer establishes an official policy or practice of a municipality sufficient to render the municipality liable for damages under 42 U.S.C. § 1983.'" (citation omitted)).

The Court rejected this theory, and the plurality contrasted this "policy" with that at issue in *Monell*. In *Monell*, a municipal department had a formal policy that expressly burdened only pregnant employees. *Id.* at 822. "Obviously, it requires only one application of a policy such as this to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy." *Id.* The policy in *Tuttle*, by contrast, was "far more nebulous, and a good deal further removed from the constitutional violation." *Id.* Whether the city "consciously chose[]" a policy of inadequate training could not be proven by one constitutional violation. *Id.* at 823. And an attenuated causal chain (such as attributing the constitutional violation to the "'policy' of establishing a police force") would render *Monell*'s limit on liability "a dead letter." *Id.*

Following this discussion, the plurality opinion concluded with this paragraph, which seems to be the source of the confusion here:

> Here the instructions allowed the jury to infer a thoroughly nebulous "policy" of "inadequate training" on the part of the municipal corporation from the single incident described earlier in this opinion, and at the same time sanctioned the inference that the "policy" was the cause of the incident. Such an approach provides a means for circumventing *Monell*'s limitations altogether. Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation. Under the charge upheld by the Court of Appeals the jury could properly have imposed liability on the city based solely upon proof that it employed a non-policymaking officer who violated the Constitution.

*Id.* at 823–24 (footnotes omitted).

In context, this paragraph is simply applying *Monell*'s requirements to the case's less-straightforward claim. A plaintiff must show either that his injury resulted directly from the enforcement of the municipality's policy or by showing a pattern demonstrating some kind of deliberate, unstated "policy" (in *Monell*'s words, "custom") that caused the injury. *See Monell*, 436 U.S. at 690–91. A "single incident" does not establish that pattern. *Tuttle*, 471 U.S. at 823–24.

12

The footnote that appears toward the end of the paragraph reinforces this message. *Id.* at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between the training inadequacies alleged, and the particular constitutional violation at issue.").

But the phrases "unconstitutional municipal policy" and "single incident" have spawned some confusion. Indeed, even Justice Brennan's controlling concurrence noted that he did "not understand, nor … see the necessity for, the metaphysical distinction between policies that are themselves unconstitutional and those that cause constitutional violations. If a municipality takes actions … that cause the deprivation of a citizen's constitutional rights, § 1983 is available as a remedy." *Id.* at 833 n.8 (Brennan, J., concurring in part and concurring in the judgment) (citation omitted).

A few years later, in *City of Canton v. Harris*, 489 U.S. 378 (1989), the Court revisited the question whether "only unconstitutional policies are actionable under [§ 1983]." *Id.* at 387. Like *Tuttle*, *Harris* was also an "inadequate training" case. And it held "that there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability." *Id.* In deciding what "degree of fault must be evidenced," the Court again looked to *Monell*'s "admonition … that a municipality can be liable … only where its policies are the moving force behind the constitutional violation." *Id.* at 388–89 (cleaned up). As such, liability was permitted "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. Zooming out, the Court again confirmed (as it did in *Tuttle*) that the key questions were whether inadequate training could fairly be considered a city "policy" and whether that policy "caused" the constitutional violation. *Id.* at 389–92.

In applying *Tuttle* and *Harris*, at least one court in this circuit has used the shorthand (which the City seems to adopt here) that "[t]he policy must be either facially unconstitutional, [under *Tuttle*], or unconstitutional as applied because of the municipality's 'deliberate indifference' to the rights of persons with whom municipal employees may encounter [under *Harris*]." *Knicrumah v. Albany City Sch. Dist.*, 241 F. Supp. 2d 199, 206 (N.D.N.Y. 2003); *see also Bennett v. Town of Riverhead*, 940 F. Supp. 481, 490 (E.D.N.Y. 1996).

This articulation might work for some cases, like the failure-to-train claims at issue in *Tuttle* and *Harris*. But it misses a wide swath of *Monell*'s heartland: constitutional violations caused by a policy's *proper* "implement[ation] or execut[ion]." Neither *Tuttle* nor *Harris* purported to cabin or overturn this part of *Monell*. Instead, they mapped *Monell* onto a difficult landscape in which it was unclear what the municipality's decisions were and whether they really caused the tort. In *Harris*, there could be no municipal liability when "one of its employees *happened to* apply [its] policy in an unconstitutional manner." 489 U.S. at 387 (emphasis added). But if an official policy specifically directs or authorizes an unconstitutional action, the municipality has made a choice for which it may be held liable. And in that application of the policy, the policy is "itself unconstitutional" as *Tuttle* meant it. *Cf. Tuttle*, 471 U.S. at 820 ("Respondent did not claim … that Oklahoma City had a 'custom' or 'policy' of authorizing its police force to use ex-

13

cessive force in the apprehension of suspected criminals[.]"); *id.* at 821 ("[T]he origins of *Monell*'s 'policy or custom' requirement should make clear that, at the least, that requirement was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers.").

So the logic of *Monell*, *Tuttle*, and *Harris* confirms that the City's policy need not be facially unconstitutional so long as it causes the unconstitutional act. Their language does too. *Monell* itself framed the "cause[s] to be subjected" inquiry in several ways: whether the "action *pursuant to* official municipal policy of some nature caused a constitutional tort," whether the municipality, "under color of some official policy, '*causes*' an employee to violate another's constitutional rights," whether "*execution* of a government's policy or custom … inflicts the injury," and whether "official policy [is] the *moving force* of the constitutional violation." 436 U.S. at 691–92, 694 (emphasis added). *Tuttle* echoes *Monell* in emphasizing the need for an "affirmative link" between the policy and the injury, 471 U.S. at 824 n.8, and *Harris* does the same in requiring that they be "closely related," 489 U.S. at 391.

This reading of *Monell*, *Tuttle*, and *Harris* is also most consistent with *Monell*'s later progeny. One of the Court's more recent in-depth looks at *Monell* summarized it this way:

> In sum, in *Monell* the Court held that "a municipality cannot be held liable" solely for the acts of others, *e.g.*, "*solely* because it employs a tortfeasor." 436 U.S., at 691. But the municipality may be held liable "when execution of a government's *policy or custom* … inflicts the injury." *Id.*, at 694 (emphasis added).

*Los Angeles County v. Humphries*, 562 U.S. 29, 36 (2010); *see also Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (similar); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("[I]n *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."); *id.* at 404 ("Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward."); *id.* at 417 (Souter, J., dissenting) ("[T]he policy requirement … is certainly met when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy."); *Pembaur*, 475 U.S. at 479 ("The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988) (Brennan, J., concurring in the judgment) ("Where [the municipality's] agents act in accordance with formal policies … we naturally ascribe their acts to the municipalities themselves and hold the latter responsible for any resulting constitutional deprivations."); *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (similar); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("[I]solated acts … are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability. On the other hand, such acts would justify liability of the municipality if, for example, they were done pursuant to municipal policy[.]" (citations omitted)); *Outlaw v. City of Hartford*, 884 F.3d 351, 373

14

(2d Cir. 2018) ("[I]nherent in the principle that 'a municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation,' is the concept that the plaintiff must show 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" (quoting *Harris*, 489 U.S. at 385, 389 (alteration in original))); *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) ("The express policy theory applies, as the name suggests, where a policy explicitly violates a constitutional right when enforced."); *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1280 (10th Cir. 2009) ("If a governmental entity makes and enforces a law that is unconstitutional as applied, it may be subject to liability under § 1983."); *Right-Now Recycling, Inc. v. Ford Motor Credit Co.*, 2015 WL 1197671, at *5 (S.D. Ohio Mar. 16, 2015) ("[I]t has been recognized that a municipality may be liable under § 1983 when a written policy as applied in a straightforward manner results in a constitutional violation."), *aff'd*, 644 F. App'x 554 (6th Cir. 2016).

Not to mention, requiring facial unconstitutionality would lead to strange results. To start, requiring a plaintiff to prove that a policy is facially unconstitutional flips the usual order of operations on its head:

> It is not the usual judicial practice, however, nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied. Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws. Moreover, the overbreadth question is ordinarily more difficult to resolve than the as-applied, since it requires determination whether the statute's overreach is substantial, not only as an absolute matter, but "judged in relation to the statute's plainly legitimate sweep," and therefore requires consideration of many more applications than those immediately before the court. Thus, for reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first.

*Bd. of Trustees v. Fox*, 492 U.S. 469, 484–85 (1989) (citation omitted).

And consider this hypothetical: A city's official policy instructs police to use pepper spray whenever an arrestee fails to follow police commands. That policy has some constitutionally permissible applications (and is outside the First Amendment context), so it isn't facially unconstitutional. *United States v. Salerno*, 481 U.S. 739, 745 (1987). For example, if a suspect refuses to raise his hands and instead reaches for a weapon, pepper spray likely isn't excessive force. But an officer following that policy would also plainly be using unconstitutionally excessive force in many situations. For instance, if a suspect is already handcuffed and simply declines to seat himself in the backseat of the police car (without physically resisting), using pepper spray could be excessive. *See Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010). Yet under the City's theory, so long as it drew its policy broadly enough to sweep in some constitutional applications, it could never be held liable for unconstitutional acts that it caused. That theory is plainly inconsistent

15

with both *Monell* (indeed, it would essentially nullify it) and § 1983's application to acts that "cause[] [any person in the United States] to be subjected" to a constitutional tort.

Returning to the facts here, it should be clear that this case is classic *Monell*. There is no question about how many grains of unconstitutional action add up to a pile of "policy." So *Tuttle*'s analysis of "single incident[s]" is inapt. Nor is there a complicated web of causation to untangle. Instead, applying the DOF's code of conduct and social-media policy led directly to the investigation of Persaud, the charges leveled against him, and his firing (subject to the causation disputes discussed above). So there is at least a triable issue of fact whether those policies were the "moving force" behind the individual defendants' actions. *See Inendino v. Lightfoot*, 2023 WL 2349909, at *6 (N.D. Ill. Mar. 3, 2023) (holding that a city employee's firing pursuant to a social-media policy that prohibited posts that "can be deemed offensive" supports an official-policy claim under *Monell*).

### C. The summary-judgment standard

Defendant's third argument is that the Court should not have raised the official-policy issue sua sponte. Dkt. 75 at 1. For background, Defendants' summary-judgment brief argued mainly that no final policymaker was involved, and Persaud's summary-judgment brief addressed only that argument. Yet the Court was left puzzled because the City's formal policies were discussed in the briefs. So the Court ordered the parties to submit supplemental letter briefs on the question whether the code of conduct and social-media policy were official policies that could support the *Monell* claim. Dkt. 74.

Defendants don't cite any authority suggesting that the Court acted outside its powers, and it didn't. Under Federal Rule of Civil Procedure 56(e), "[i]f a party … fails to properly address another party's assertion of fact … the court may … give an opportunity to properly support or address the fact … or … issue any other appropriate order." Here, Defendants asserted that "Plaintiff has adduced no evidence of any unconstitutional municipal policy." Dkt. 65 at 23. Persaud failed to address that assertion, but to be fair, Defendants also failed to grapple with the relevance of the code of conduct and social-media policy that their own briefing mentioned. So the Court gave both sides an opportunity to address this issue specifically.

Similarly, Rule 56(f)(3) empowers the Court to "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Here, the Court identified the fact that the code of conduct and social-media policy may be official policies that caused the adverse action, and it gave the parties notice and a week to respond. Dkt. 74. Having received those responses, it has considered summary judgment on its own and will deny it. Under either provision, the Court may solicit arguments that might result in denying summary judgment.

More generally, Rule 56 permits the Court relatively wide discretion to ensure that all issues are aired. For example, Rule 56(c)(3) empowers the Court to consider uncited materials in the record. And under Rule 56(f)(2), the Court may *grant* summary judgment on "grounds not raised by a party" so long as it gives "notice and a reasonable time to respond." Although that provision

16

doesn't expressly authorize denying the motion on grounds not initially raised, courts are generally permitted far greater leeway in denying motions than in granting them. *Cf. Kowalchuck v. Metro. Transp. Auth.*, 94 F.4th 210, 217–18 (2d Cir. 2024) (distinguishing between sua sponte denials and grants of summary judgment when converting pre-motion letters to motions).

### III.   The collateral-estoppel issues are irrelevant to this motion

Finally, Defendants argue that a number of the ALJ's "factual findings are entitled to preclusive effect." Dkt. 65 at 7 (capitalization omitted). In particular, Defendants say that "[t]his Court is bound by" the ALJ's findings that (1) the DOF's webmaster received four complaints, (2) Persaud (rather than his dad) wrote the comment, (3) Persaud "was guilty of all of the misconduct with which he was charged," and (4) that misconduct "warranted his termination." *Id.* at 8.

As an initial matter, the motion-to-dismiss opinion in this case already rejected Defendants' issue-preclusion arguments with respect to other facts supposedly found by the ALJ. *Persaud v. City of New York*, 2023 WL 2664078, at *3–4 (S.D.N.Y. Mar. 28, 2023) (Vyskocil, J.). The opinion specifically noted that the purported findings must have been *necessary* to the ALJ's judgment. *Id.* Yet Defendants have again failed to explain why these facts were necessary to the ALJ's decision.

In any event, none of these facts matters for this motion. The first is undisputed. The second is irrelevant. *See* note 1, *supra*. And the third and fourth refer to "misconduct," but the ALJ's own description of Persaud's "misconduct" includes both his "post[ing] derogatory content" and his "refusal to cooperate." Dkt. 67-11 at 8. The whole issue here is identifying which one caused the adverse actions.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment is DENIED. The Clerk of Court is directed to close Dkt. 64. By May 17, 2024, the parties shall provide availability for trial in July, August, and September 2024.

SO ORDERED.

Dated: May 14, 2024
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge